**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| ALIEDA MARON and LAWRENCE MARON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BLAISE INGOGLIA, in his official capacity as the Chief Financial Officer of the State of Florida and ANASTASIOS KAMOUTSAS, in his official capacity as Florida Commissioner of Education, <br><br> Defendants. | Case No: <br><br> 4:22-cv-00255-RH-MAF |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND
<u>MEMORANDUM IN SUPPORT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ...............................................................................................1

LEGAL STANDARD..........................................................................................2

ARGUMENT AND AUTHORITIES..................................................................3

I.      Plaintiffs Have Standing to Bring Their Claim and Are Proposed Class Members ..........................................................................................................3

II.     The Proposed Class Satisfies the Requirements of Rule 23(a)........................5

        A.     Numerosity ........................................................................................5

        B.     Commonality .....................................................................................6

        C.     Typicality.........................................................................................12

        D.     Adequacy..........................................................................................13

III.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2) .................17

IV.    The Proposed Class Satisfies the Requirements of Rule 23(b)(1)(A)............19

REQUEST FOR RELIEF ..................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*,
    197 F.R.D. 522 (S.D. Fla. 2000)...............................................................19

*Alliance to End Repression v. Rochford*,
    565 F.2d 975 (7th Cir. 1977) ...................................................................18

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997)..................................................................................20

*Carter v. City of Montgomery*,
    108 F.4th 1334 (11th Cir. 2024).................................................................12

*Cedar Point Nursery v. Hassid*,
    594 U.S. 139 (2021)....................................................................................7

*Cox v. Am. Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986) ...................................................................5

*Gates v. Towery*,
    No. 04 C 2155, 2004 WL 2583905 (N.D. Ill. Nov. 10, 2004),
    *aff'd*, 430 F.3d 429 (7th Cir. 2005)...........................................................18

*Hoffer v. Jones*,
    323 F.R.D. 694 (N.D. Fla. 2017) ........................................................ 12, 18

*In re Checking Acct. Overdraft Litig.*,
    281 F.R.D. 667 (S.D. Fla. 2012)..................................................................5

*Jacobs v. U.S.*,
    290 U.S. 13 (1933)....................................................................................13

*Kenny A. ex rel. Winn v. Perdue*,
    218 F.R.D. 277 (N.D. Ga. 2003 ..................................................................12

*Maron v. Chief Financial Officer of Fla.*,
    136 F.4th 1322 (11th Cir. 2025)..................................................................14

*Muzuco v.Re$ubmitit,*
297 F.R.D. 504 (S.D. Fla. 2013)..................................................................16

*Padron v. Feaver*,
180 F.R.D. 448 (S.D. Fla. 1998)..................................................................13

*Palm Beach Golf Center-Boca, Inc. v. Sarris*,
311 F.R.D. 688 (S.D. Fla. 2015)....................................................................5

*Piazza v. Ebsco Indus., Inc.*,
273 F.3d 1341 (11th Cir. 2001) .....................................................................2

*Pizarro v. Home Depot, Inc.*,
No. 1:18-cv-01566-WMR, 2020 WL 6939810 (N.D. Ga. Sept. 21, 2020) ....19

*Powers v. Gov't. Emps. Ins. Co.*,
192 F.R.D. 313 (S.D. Fla. 1998)..................................................................16

*Stewart v. Winter*,
669 F.2d 328 (5th Cir.1982) ...........................................................................7

Strawser v. Strange,
307 F.R.D. 604 (S.D. Ala. 2015)..................................................................20

*Surowitz v. Hilton Hotels Corp.*,
383 U.S. 363 (1966)......................................................................................16

*Valley Drug. Co. v. Geneva Pharms., Inc.*,
350 F.3d 1181 (11th Cir. 2003) ....................................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).............................................................................. 6, 17, 19

*Williams v. Mohawk Indus., Inc.*,
568 F.3d 1350 (11th Cir. 2009) ......................................................................7

**Statutes**

Fla. Stat. § 717.124(4)(a) ......................................................................... 1, 18

**Rules**

Fed. R. Civ. P. 23(a)......................................................................................2

iii

Fed. R. Civ. P. 23(b)(1)(A) ...................................................................... 2, 19, 20, 21

Fed. R. Civ. P. 23(b)(2) ............................................................................. 2, 17, 18

**INTRODUCTION**

The State of Florida (the "State"), acting through Defendants[1], takes custody of presumed unclaimed property and makes public use of it, requiring it to pay just compensation to the property's owners when they successfully make claims for their property's value. The State will pay property owners part of just compensation: the property's market value.[2] However, the State interprets Fla. Stat. 717.124(4)(a) (the "Act") as prohibiting it from paying property owners interest to compensate them for the delay between the time of the taking and the time of payment: a required part of just compensation.

Because the State will refuse to pay interest to all Proposed Class members, it acts towards the Proposed Class on generally applicable grounds, making declaratory and injunctive relief and certification under Federal Rule of Civil Procedure 23(b)(2) appropriate. Indeed, this civil rights case is a classic example of the type of case that Rule 23(b)(2) was created to facilitate. Because the State must treat all Proposed Class members alike, the prosecution of individual actions by them risks inconsistent or varying adjudications, which could impose inconsistent

---

[1] "Defendants" refer to Blaise Ingoglia, in his official capacity as the Chief Financial Officer of the State of Florida and Anastasios Kamoutsas, in his official capacity as Florida Commissioner of Education.

[2] In the case of money, its market value is the amount taken into custody. In the case of non-monetary property, its market value is the proceeds of its sale by the State.

standards of conduct on the State. Thus, certification under Rule 23(b)(1)(A) is also appropriate.

## LEGAL STANDARD

For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must satisfy all four of the threshold requirements set forth in Federal Rule of Civil Procedure 23(a) and then show that the action is maintainable under at least one of the three provisions of Rule 23(b). *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1345-47 (11th Cir. 2001). The four threshold requirements are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Id.* at 1346.

> Federal Rule of Civil Procedure 23(b) allows certification where:
>
> (1) prosecuting separate actions by or against individual class members would create a risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, or …
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; ….

Fed. R. Civ. P. 23(b)(1)(A) & (2).

2

## ARGUMENT AND AUTHORITIES

I.    **Plaintiffs[3] Have Standing to Bring Their Claim and Are Proposed Class Members**

Per the Second Amended Class Action Complaint (Doc. 51) ("SAC"), Plaintiffs seek certification of the following class:

> All persons or entities (including their heirs, assignees, legal representatives, guardians, administrators, and successors in interest) who are owners of unclaimed property being held in custody by the State of Florida in the form of money under the State Disposition of Unclaimed Property Act, Fla. Stat. Ch. 717, as of the date of the original complaint or who become owners of unclaimed property so held during the pendency of this litigation, and who will in the future reclaim their property from the State.

(the "Proposed Class") SAC ¶ 27. Accordingly, Plaintiffs must show they own unclaimed property held by the State and will make a claim for its value in the future to show standing and class membership.

Plaintiffs had Allstate car insurance from approximately 2005 to April of 2023 with policy number 971796354.[4] Plaintiffs lived at 509 Willow Run Knoll, Lakeland Florida 33813-3666, from 1980 until May of 2014.[5]

---

[3] Alieda Maron and Lawrence Maron together are referred throughout as "Plaintiffs" or "the Maron's".

[4] Appendix in in Support of Plaintiffs' Motion for Class Certification and Memorandum in Support filed contemporaneously herewith ("App.") Ex. A, Plaintiff's First Amended Answers to Interrogatories ("P. Interog. Answers"), No. 1.; App. Ex. B, 2/13/26 Deposition of Lawrence Maron ("L. Maron Dep.") 32:14-3:2.

[5] App. Ex. A, P. Interog. Answers, No. 1; App. Ex. B, L. Maron Dep. 10:24-11:13.

Documents received from Allstate Fire and Casualty Insurance Company in response to subpoenas show: (1) Plaintiffs were covered by Allstate auto policy no. 971796354 at 509 Willow Run Knoll, Lakeland FL 33813-3666 on April 23, 2014, (2) on April 23, 2024, Allstate issued a Safe Driving Bonus check to Plaintiffs for $26.24, (3) the $26.24 was sent to Allstate's unclaimed property account on April 24, 2015, and (5) the $26.24 was remitted by Allstate to the State on April 16, 2020.[6]

The documents produced by the Florida Department of Financial Services ("DFS") are 100% consistent with Plaintiffs' recollection and the Allstate documents, including the Plaintiffs' names and address, the policy number, the check date, amount and number, and the remittance date.[7] On behalf of DFS, Phillip Carlton, the director of the unclaimed property division of DFS, verified these documents and testified, "[a]nd it lists the specific property that's involved in this case."[8]

---

[6] App. Ex. A, P. Interog. Answers, No. 1; App. Ex. C, Allstate Documents (971796354 DEC 2013 09 05, 971796354 EBC 2014 04 25, 971796354 DEC 2014 06 12, 971796354 Payment History, 971796354 Alieda Maron and Lawrence Maron v. Blaise Ingoglia unclaimed property records, Funds on FL Unclaimed Property Website Can Be Claimed by Payee; and 26-03-11 Declaration of Custodian of Records).

[7] App. Ex. A, P. Interog. Answers, No. 1; App. Ex. D, DFS Documents (DFS003147-48 and DFS003149).

[8] App. Ex. E, 1/27/26 Deposition of Phillip E. Carlton ("Carlton Dep.") 4:14-22; 13:22-16:4; 17:25-20:9.

When Plaintiffs visited the Florida Treasure Hunt website (fltreasurehunt.gov) (the "Treasure Hunt Website"), they saw themselves listed as the owners of the $26.24 premium refund.[9] Plaintiffs did not see any other people with their names on the Treasure Hunt website.[10]

## II.    The Proposed Class Satisfies the Requirements of Rule 23(a).

### A.    Numerosity

To satisfy numerosity "'generally less than twenty-one [class members] is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Thus, substantially larger classes easily satisfy the numerosity requirements. *See In re Checking Acct. Overdraft Litig.*, 281 F.R.D. 667, 673 (S.D. Fla. 2012) (certifying a class that involved "tens- or hundreds-of-thousands" of members); *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 695 n.9 (S.D. Fla. 2015) (noting a hypothetical subset of 2,074 would satisfy numerosity requirement).

Here, Proposed Class members—persons whose property is held by the State and who will in the future make a claim for the value of their property—number at least in the hundreds of thousands. "As of September 26, 2025, there were

---

[9] App. Ex. A, P. Interog. Answers, No. 1; App. Ex. C, Allstate Documents (Funds on FL Unclaimed Property Website Can Be Claimed by Payee).

[10] App. Ex. A, P. Interog. Answers, No. 1.

44,793,078 unclaimed property accounts maintained by the Department pursuant to the Act."[11] Each account represents one piece of property. Because the State holds multiple pieces of property for some people, the number of class members is less than the number of accounts, but there are certainly tens of millions of people who have unclaimed property held by the State pursuant to the Act.[12]

Of the tens of millions of people whose property the State took for public use and still holds, millions will claim their property in the future, with tens of thousands expected to do so in the first month after the Court's final judgment alone. In Calendar Year 2024, the State paid approximately 588,000 claims for presumed unclaimed property. In Calendar Year 2025 from January through August, it paid approximately 407,000 claims for presumed unclaimed property. Every month, tens of thousands of people receive payment on claims for presumed unclaimed property collectively worth tens of millions of dollars.[13]

**B.    Commonality**

For purposes of commonality, "even a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (internal quotation marks

---

[11] App., Ex. F, Defendant Blaise Ingoglia's First Supplemental Responses to Plaintiffs' First Set of Interrogatories ("DFS Rog. Responses"), No. 7.

[12] *Id.*; App. Ex. E, Carlton Dep. 43:22-45:11.

[13] App. Ex. F., DFS Rog. Responses No. 7; App. Ex. G, DFS000003 (spreadsheet) produced by DFS; App. Ex. E, Carlton Dep. 36:7-38:16.

and citation omitted). So, commonality merely requires "that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982) (footnote omitted). Accordingly, Plaintiffs face a "low hurdle" in bearing this light burden. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). Commonality is easily satisfied here.

Plaintiffs seek a class judgment declaring that the State's application of Section 717.124(4)(a) of the Act as prohibiting the payment of interest to Plaintiffs and the Class violates the Fifth Amendment and, thus, that when they make a claim for the value of their property, the State must pay them interest for the time it was in the State's custody and being used for public purposes. SAC at 21.

The Fifth Amendment proscribes the taking of private property by the government for public use without payment of just compensation. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). In the case of a physical taking, to prevail on a takings claim, a plaintiff must prove that (1) the government physically took possession of property without acquiring title to it, (2) makes public use of it, and (3) fails to pay just compensation. *Id.* at 147-48.

All three elements are common because the State treats all presumed unclaimed property, and its owners, identically. As to the first element, the Proposed Class consists only of people for whom the State has taken physical possession of

7

their property, and they number in the millions, as set forth above. From 2020 through September 2025 alone, this amounted to billions of dollars.[14] As the State admits, it never takes title to presumed unclaimed property.[15]

As to the second element, the State makes public use of all unclaimed property it takes into possession, and that use does not vary based on the person or property type. Remittances received by the Division of Unclaimed Property of DFS (the "Division") are deposited into the Unclaimed Property Trust Fund.[16] Throughout the fiscal year the Division approves claims and administers the program. Prior to the end of the fiscal year, in May and June, transfer is initiated to the State School Trust Fund. Per 717.123, Fla. Stat., the amount transferred is any balance that exceeds $15 million.[17]

Monies deposited into the Unclaimed Property Trust Fund are held in the State Treasury as part of a single Treasury Pool Investment Fund (the "Treasury Pool") in

---

[14] App., Ex. F, DFS Rog. Responses, No. 8; App. Ex. E, Carlton Dep. 47:21-49:2.

[15] Memorandum in Support of Defendant's Motion to Dismiss Complaint (Doc. 9) at 20.

[16] To be clear, if non-monetary property is received, it is sold, and only after sale are the monetary proceeds deposited into the Unclaimed Property Trust Fund. App. Ex. H, 1/23/26 Deposition of Elizabeth S. Tatun, Assistant Director of Unclaimed Property Division ("Tatum Dep.") 33:19-34:21.

[17] App. Ex. F, DFS Rog. Responses, No. 7; App. Ex. H, Tatum Dep. 4:13-20; 20:10-22:7.

which all State funds are invested where they earn interest before their transfer to the State School Fund. They are not accounted for as a separate, fund-level investment account (and are thus referred to as a "non-investible account"), which means the interest earned goes into the State's general revenues and not into the Unclaimed Property Trust Fund.[18]

Once unclaimed property is placed in the Unclaimed Property Trust Fund, which is sometimes after the sale of non-monetary property, "all funds under 717 are treated the same." No person's money in the Unclaimed Property Trust Fund is treated differently than any other person's money. Likewise, except for sale of non-monetary property, treatment of unclaimed property does not vary by type of property.[19]

Before transferring monies to the State School Fund, DFS deducts the costs incurred by the State in administering and enforcing the Act from the Unclaimed Property Trust Fund.[20] Monies deposited into the State School Trust Fund can be

---

[18] App., Ex. F, DFS Rog. Responses, Nos 11 & 12; App. Ex. I, 1/29/26Deposition of Tanner E. Collins, Director of the Florida Treasury ("Collins Dep.") 4:15-18; 16:2-6; 16:14-17:15; 18:2-19:18; 21:8-22:25.

[19] App. Ex. H, Tatum Dep. 18:1-17; App. Ex. I, Collins Dep. 31:8-32:25; App. Ex. E, Carlton Dep. 57:23-58:4.

[20] App., Ex. F, DFS Rog. Responses, No. 10; App. Ex. J, 1/7/26 Defendant Blaise Ingoglia's Fifth Supplemental Responses to Plaintiffs' First Set of Requests for Production ("DFS RFP Responses"), No. 6; App. Ex. K, DFS Expense Deduction Docs. (DFS000189 (native spreadsheet), DFS000556 (native spreadsheet),

9

designated to the State School Fund, which is a separate fund-level investment fund (referred to as an "investable account") held in the State Treasury as part of the same Treasury Pool for the State as the Unclaimed Property Trust Fund, which earns interest that is credited back to the State School Fund. For the last five years, all the money in the State School Trust Fund has been designated, so all the interest has gone back to the State School Trust Fund. Had any money not been designated, it still would have been invested by the State Treasury and the interest it earned would have gone into general revenues.[21] After the money is transferred to the State School Trust Fund: no person's money is treated any differently than any other person's money.[22]

In the last five fiscal years, pursuant to the Florida Constitution, Article 9, Section 6, the Legislature has appropriated income and principal from the State

---

DFS002906 (native spreadsheet), DFS003134 (native spreadsheet), DFS003145 (native spreadsheet), and DFS003146 (native spreadsheet)).

[21] App. Ex. F, DFS Rog. Responses, Nos. 14 & 15; App. Ex. L, 1/7/26 Defendant Blaise Ingoglia's First Supplemental Responses to Plaintiffs' First Set of Requests for Admission ("DFS Admissions"), Nos. 8, 9 & 14; App. Ex. I, Collins Dep., 33:1-37:12; 47:1-48:25; App. Ex. M, 12/23/25 Defendant Anastasios Kamoutsas' Responses to Plaintiff's First Set of Requests for Admission ("DOE Admissions"), No. 5 & 7; App. Ex. N, 12/23/25 Defendant Anastasios Kamoutsas' Responses to Plaintiff's First Set of Interrogatories ("DOE Rog. Responses"), No. 7; App. Ex. O, 1/23/26 Deposition of Lila S. Pridgeon, Deputy Commissioner of Finance and Operations for DOE ("Pridgeon Dep.") 5:12-18; 23:6-22; 34:8-38:6.

[22] App. Ex. O, Pridgeon Dep. 41:20-42:5.

School Fund to the support and maintenance of free public schools, including monies paid to school districts for general operations and specifically to reduce class sizes, which provides a benefit to the public. The earning of interest on the funds in the State School Fund available for appropriation alone provides a benefit to the public.[23]

The Florida Department of Education ("DOE") pays an administrative fee to DFS's Treasury Department (the "Treasury Division") out of the State School Trust Fund for administering it, which benefits the public.[24] The Treasury Division deducts a 12% administrative fee from the entire Treasury Pool it manages, which includes the monies in the Unclaimed Property Trust Fund and the State School Fund.[25]

As to the third element, DFS refuses to pay interest when it pays claims for presumed unclaimed property because it contends that Fla. Stat. 717.124(4)(a) forbids it to do so by requiring it to only "deliver or pay over to the claimant the property or the amount that that was reported and remitted to the Department by the holder or the proceeds if the unclaimed property was sold by the Department[.]" "The agency lacks authority to deviate from or supplement this statutory directive."[26]

---

[23] App. Ex. O, Pridgeon Dep., 22:6-9; 23:23-24:21; 25:3-29:13.

[24] *Id.*, 30:8-23.

[25] App. Ex. I, Collins Dep., 37:14-45:12.

[26] App. Ex. F, DFS Rog. Responses, No.1; App. Ex. L, DFS Admissions, Nos. 4 & 11.

11

That is the same for everyone for whom the State currently holds unclaimed property except for one very limited exception for Cuban refugees.[27]

Finally, the State's defense to the Proposed Class's takings claim is common because it contends its uniform treatment of presumed unclaimed property does not constitute a compensable taking as to *any* owners of presumed unclaimed property (class members).[28]

## C.    Typicality

"A class representative satisfies the typicality requirement if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Carter v. City of Montgomery*, 108 F.4th 1334, 1341 (11th Cir. 2024) (internal quotation marks and citation omitted). Thus, "a class representative must possess the same interest and suffer the same injury as the class members." *Id.* (internal quotation marks and citation omitted). S*ee, e.g., Hoffer v. Jones*, 323 F.R.D. 694, 698-99 (N.D. Fla. 2017) (finding typicality requirement met because claims arose from same government conduct); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 301-02 (N.D. Ga. 2003) (finding Rule 23 typicality existed where foster children challenged state policies and practices affecting the child welfare system); *Padron v. Feaver*, 180 F.R.D. 448, 455

---

[27] App Ex. E, Carlton Dep. 58:6-59:9.

[28] App. Ex. E, Carlton Dep. 51:14-52:12; 53:12-19.

(S.D. Fla. 1998) (finding Rule 23 typicality established where applicants for benefits challenged a state agency's application processing practices).

Here, the State has already and will continue to subject Plaintiffs and all Proposed Class members to the exact same conduct. It has taken possession of their property without taking title to it, and it has made public use of it. Most importantly, when Plaintiffs and the members of the Proposed Class claim their property in the future, the State will not pay them the interest that just compensation under the Fifth Amendment requires.[29]

### D.    Adequacy

"Rule 23(a)(4) requires that the representative party in a class action must adequately protect the interests of those he purports to represent." *Valley Drug. Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal quotation marks and citation omitted).  "This adequacy of representation analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Id.*

---

[29] When the government takes private property for public use, it must pay as just compensation not only "the value of the property at the time of taking," but also "such addition as will produce the full equivalent of that value *paid contemporaneously with the taking*." *Jacobs v. U.S.*, 290 U.S. 13, 17 (1933) (internal quotation marks and citation omitted) (emphasis added). "Interest at a proper rate is a good measure by which to ascertain the amount to so be added." *Id.* (internal quotation marks and citation omitted).

13

Plaintiffs have no conflicts of interest, much less substantial ones, with the other members of the Proposed Class.  No reason exists why the conduct or outcome of the litigation would benefit Plaintiffs but harm other members of the Proposed Class.[30] Specifically, Plaintiffs seek to force the State to pay interest when it pays claims for unclaimed property, and no other Proposed Class members will suffer harm from receiving interest in addition to the market value of their property.[31]

Plaintiffs will adequately represent the Proposed Class. This is demonstrated initially by their hiring of counsel with significant experience in successfully prosecuting class actions.[32] After the Court initially dismissed this case, Plaintiffs' counsel appealed to the Eleventh Circuit and obtained a judgment reversing the dismissal. *Maron v. Chief Financial Officer of Fla.*, 136 F.4th 1322, 1344 (11th Cir. 2025). Plaintiffs' counsel have also served written discovery requests reviewed responsive documents, responded to written discovery requests, produced documents, obtained third party discovery, taken four depositions, defended Plaintiffs' depositions, filed this Motion, and will soon be filing a motion for

---

[30] App. Ex. P, Joint Declaration of Lawrence and Alieda Maron ("Maron Dec.") ¶¶1-2; App. Ex. Q, Declaration of Roger L. Mandel ("Mandel Dec.") ¶8.

[31] *Id.*

[32] App. Ex. Q, Mandel Dec. ¶¶1-5.

summary judgment.[33]

Further, nothing about Plaintiffs' backgrounds would prevent them from serving as class representatives. Lawrence Maron is 75 years old, married to Alieda Maron, has a bachelor's degree in civil engineering from Columbia University and a master's degree in water resources from Stanford University.[34] Alieda Maron is 68 years old, married to Lawrence Maron for 45 years, completed one year of college, worked in the public schools for 12 years and as an assistant librarian in St. Pete Beach.[35]

As their depositions demonstrate, they understand that the purpose of this class action lawsuit is to force the State to pay interest in addition to market value on claims for unclaimed property of all types, and that everyone will get the same interest rate, and they propose they be appointed class representatives.[36] They also understand they are bringing the case not only on behalf of themselves but also on behalf of the other members of the Proposed Class.[37] Indeed, they brought the suit

---

[33] *Id.* ¶6.

[34] App. Ex. B, L. Maron Dep. 8:21-9:10.

[35] App. Ex. R, 2/26/26 Deposition of Alieda Maron ("A. Maron Dep.") 11:13-12:19.

[36] App. Ex. B, L. Maron Dep. 54:18-21; 57:1-5; 58:14-59:5; App. Ex. R, A. Maron Dep. 65:9-67:1; 71:18-21; 72:19-25.

[37] App. Ex. B, L. Maron Dep. 29:23-30:5.

not to recover compensation for themselves, but rather to help the Proposed Class and do what's right.[38]

The Marons' basic understanding of the nature of their claims and their awareness that they are acting on behalf of the Proposed Class, not just themselves, more than suffices to establish their adequacy as class representatives. "It is well-settled that it is not necessary for named class representatives to be knowledgeable, intelligent or have a firm understanding of the legal or factual basis on which the case rests in order to maintain a class action." *Powers v. Gov't. Emps. Ins. Co.*, 192 F.R.D. 313, 317 (S.D. Fla. 1998) (citations omitted). Indeed, in *Surowitz v. Hilton Hotels Corp.*, the Supreme Court found the proposed class representative adequate even though she did not understand her complaint, could not explain statements in it, had little knowledge of the nature of the lawsuit, and did not even know the defendant's name. 383 U.S. 363 (1966).

What is important is that the Proposed Class representatives are participating actively in the case. *See Muzuco v.Re$ubmitit*, 297 F.R.D. 504, 517 (S.D. Fla. 2013) (finding plaintiff adequate because she appeared for deposition, produced documents, appeared for mediation, and offered knowledge of the facts underlying her individual claim); *Powers*, 192 F.R.D. at 318 (finding plaintiff adequate because

---

[38] App. Ex. R, A. Maron Dep. 29:22-30:2.

16

she appeared for deposition, produced documents, and conferred with counsel). The Maron's have been actively participating in the case.

They prepared for and appeared for depositions, provided information for, reviewed and verified interrogatory answers, reviewed requests for production, searched for responsive documents, regularly conferred with counsel, reviewed the Second Amended Complaint before it was filed, and they believe that they have fulfilled their responsibilities as class representatives.[39]

## III.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2)

Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' [citation omitted]. In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc.*, 564 U.S. at 360.

Here, as set forth above in connection with commonality, the State applies the

---

[39] App. Ex. B, L. Maron Dep. 15:1-21; 34:4-36:25; App. Ex. R, A. Maron Dep. 15 :10-16 :6; 85:8-20; App. Ex. P, Maron Dec. ¶3; App. Ex. Q, Mandel Dec. ¶7.

Act uniformly to all people for whom the State holds presumed unclaimed property, including applying Fla. Stat. § 717.124(4)(a) as prohibiting the State from paying interest on successful property owner claims. Accordingly, the State "has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2).

"[F]inal injunctive relief or corresponding declaratory relief [will thus be] appropriate respecting the class as a whole." *Id*. A single declaration that Fla. Stat. § 717.124(4)(a) is unconstitutional as applied by the State because it violates the Fifth Amendment and an injunction prohibiting its enforcement in that manner and requiring payment of interest in connection with future claims would provide relief to each member of the Proposed Class.

Moreover, courts regularly use Rule 23(b)(2) to certify claims involving constitutional or statutory challenges to government policies or practices such as those here. *See, e.g.*, *Alliance to End Repression v. Rochford*, 565 F.2d 975, 979 (7th Cir. 1977) (affirming a Rule 23(b)(2) certification of a claim to stop a government agency's institutionalized unlawful espionage against U.S. citizens); *Hoffer*, 323 F.R.D. at 699 (certifying class for purposes of forcing change to unconstitutional statewide policy and practice regarding medical care of prisoners); *Gates v. Towery*, No. 04 C 2155, 2004 WL 2583905, at *8 (N.D. Ill. Nov. 10, 2004), *aff'd*, 430 F.3d 429 (7th Cir. 2005) (certifying a Rule 23(b)(2) class for claims that the City of Chicago was unconstitutionally retaining property seized from arrestees); *Access*

18

*Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*, 197 F.R.D. 522, 529 (S.D. Fla. 2000) (certifying nationwide class of individuals seeking compliance with ADA from medical facilities and noting that Rule 23(b)(2) was created specifically for civil rights cases).

Notably, no separate proof of the Rule 23(b)(3) predominance and superiority requirements is necessary for certification under Rule 23(b)(2). *Wal-Mart Stores, Inc.*, 564 U.S. at 362-63. This is because predominance and superiority are self-evident when certification under Rule 23(b)(2) is appropriate. *Id.* at 363. Finally, under Rule 23(b)(2), notice to the class and the right to opt-out are not mandatory. *Id.* at 362.

Accordingly, the Proposed Class satisfies the requirements of Rule 23(b)(2), and the Court should grant certification.

## IV. The Proposed Class Satisfies the Requirements of Rule 23(b)(1)(A)

Under Rule 23(b)(1)(A), "certification is appropriate where defendants owe 'duties toward[ ] numerous persons constituting a class,' such that 'conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern [their] conduct.'" *Pizarro v. Home Depot, Inc.*, No. 1:18-cv-01566-WMR, 2020 WL 6939810, at *12 (N.D. Ga. Sept. 21, 2020) (quoting Fed. R. Civ. P. 23, Advisory Comm. Note, 1996 amend., sub. (b)(1)(A)). This rule "takes in cases where the party is obliged by law to treat the members of the class

19

alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (internal quotation and citation omitted).

Here, the State owes duties under the Act and the Fifth Amendment to the Proposed Class—all owners of presumed unclaimed property whose property is currently held by the State and who will make a claim for it in the future. The State is obligated by the Act and the Fifth Amendment to treat the members of the Proposed Class alike. If one judgment holds that the State's application of Fla. Stat. § 717.124(4)(a) violates the Fifth Amendment and enjoins the State to pay interest in the future and another holds the current practice is not unconstitutional, the State will be subject to incompatible standards of conduct.

Civil rights cases fall neatly within Rule 23(b)(1)(A). For example, in *Strawser v. Strange*, a class of same sex couples sought to enjoin Alabama probate judges from enforcing Alabama's laws prohibiting the issuance of marriage licenses to same-sex couples.  307 F.R.D. 604, 608 (S.D. Ala. 2015). The court certified the class finding, "it is clear that the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications." *Id.* at 614. The same is true here.

20

The class certified under Rule 23(b)(1)(A) will be a mandatory, no opt-out class. *Piazza*, 273 F.3d at 1352.

Accordingly, the Proposed Class also satisfies the requirements for certification under Rule 23(b)(1)(A), and the Court should grant certification.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request the Court grant Plaintiffs' Motion for Class Certification and: (1) certify a class as defined herein; (2) appoint Plaintiffs as the class representatives; (3) appoint their counsel as Class Counsel, and (4) grant them all other relief to which they may be justly entitled.

Dated: June 5, 2026

**SMITH, KATZENSTEIN & JENKINS LLP**

*/s/ Kelly A. Green*

**JEEVES LAW GROUP, P.A.**
Scott R. Jeeves, FBN: 0905630
2100 1st Ave. S, Suite 2
St. Petersburg, Florida 33712
Telephone: (727) 894-2929
sjeeves@jeeveslawgroup.com

Kelly A. Green (admitted *pro hac vice*)
Julie M. O'Dell (admitted *pro hac vice*)
Lauren A. (Ferguson) Black
  (admitted *pro hac vice*)
1000 N. West Street, Suite 1501
Wilmington, Delaware 19801
(302) 652-8400
kag@skjlaw.com
jmo@skjlaw.com
lab@skjlaw.com

**CRAIG E. ROTHBURD, P.A.**
Craig E. Rothburd,
FBN: 0049182
320 W. Kennedy Blvd., #700
Tampa, Florida 33606
Telephone: (813) 251-8800
Fax: (813) 251-5042
craig@rothburdpa.com
maria@rothburdpa.com

**Jeeves Law Group, P.A.**
Roger L. Mandel (admitted *pro hac vice*)
2833 Crockett Street, Suite 135
Fort Worth, TX 76107
Telephone: 214-253-8300
rmandel@jeevesmandellawgroup.com

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF WORD COUNT

Pursuant to Northern District of Florida Local Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing motion and memorandum in support contains 4,798 words, which were counted by using Microsoft Word 365.

/s/ Kelly A. Green
Kelly A. Green (admitted *pro hac vice*)
DE Bar ID 4095

## LOCAL RULE 7.1 CERTIFICATE

Pursuant to Northern District of Florida Local Rule 7.1(B) and (C), the undersigned counsel hereby certifies that the Parties conferred in good faith regarding the relief requested in this motion and memorandum in support, and Defendant does not consent to the relief sought herein.

/s/ Kelly A. Green
Kelly A. Green (admitted *pro hac vice*)
DE Bar ID 4095

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June, 2026, a PDF copy of the foregoing was electronically transmitted to the Clerk of the Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

/s/ Kelly A. Green
Kelly A. Green (admitted *pro hac vice*)
DE Bar ID 4095

22