**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

ALIEDA MARON and LAWRENCE MARON, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BLAISE INGOGLIA, in his official capacity as the Chief Financial Officer of the State of Florida and ANASTASIOS KAMOUTSAS, in his official capacity as Florida Commissioner of Education,

Defendants.

Case No: 4:22-cv-00255-RH-MAF

# PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii
INTRODUCTION ........ 1
LEGAL STANDARD ........ 2
UNDISPUTED FACTS ........ 3
ARGUMENT AND AUTORITIES ........ 10
I. THE CONTOURS OF A TAKINGS CLAIM ........ 10
II. THE FIFTH AMENDMENT AND THE ELEVENTH CIRCUIT'S DECISION IN THIS CASE DICTATE SUMMARY JUDGMENT IN FAVOR OF PLAINTIFFS AND THE CLASS DECLARING THAT SECTION 717.124(4)(A), FLORIDA STATUTES, AS APPLIED BY DFS, IS UNCONSTITUTIONAL AND UNENFORCEABLE ........ 13
A. PLAINTIFFS' OWNERSHIP OF THE REFUND AND THE CLASS'S OWNERSHIP OF THEIR PROPERTY HELD BY THE STATE ARE UNDISPUTED ........ 14
B. THE STATE'S APPROPRIATION OF PLAINTIFFS' REFUND FOR PUBLIC USE IS UNDISPUTED ........ 15
C. IT IS UNDISPUTED THAT DFS APPLIES THE ACT AS PRECLUDING THE PAYMENT OF JUST COMPENSATION ........ 16
III. THE STATE'S LEGAL DEFENSES HAVE BEEN REJECTED BY THE ELEVENTH CIRCUIT AND/OR HAVE NO MERIT ........ 17
A. THE ACT DID NOT DECLARE OR RENDER THE REFUND OR THE PROPERTY OF OTHER CLASS MEMBERS ABANDONED ........ 17

B. PLAINTIFFS' AND CLASS MEMBERS' RIGHT TO JUST COMPENSATION DOES NOT DEPEND ON WHETHER THEIR PROPERTY EARNED INTEREST BEFORE THE STATE TOOK CUSTODY OF IT.......................................... 18

CONCLUSION AND REQUEST FOR RELIEF...................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 2, 3

*Ark. Game & Fish Comm'n v. U.S.*,
568 U.S. 23 (2012) .......... 13

*Brown v.* Legal *Foundation of Washington*,
538 U.S. 216 (2003) .......... 22

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) .......... 14, 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 2

*Goldberg v. Frerichs*,
912 F. 3d 1009 (7th Cir 2019) .......... 21, 24

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) .......... 11

*Horne v. Dept. of Agric.*,
576 U.S. 351 (2015) .......... 13, 14

*Jackson v. Athena Bitcoin, Inc.*,
2025 WL 2377671 (N.D. Fla. 2025) .......... 3

*Jacobs v. U.S.*,
290 U.S. 13 (1933) .......... 22, 23

*Knick v. Township of Scott*,
588 U.S. 180 (2019) .................................................... 13, 15

*Maron v. Chief Financial Officer of Fla.*,
136 F.4th 1322 (11th Cir. 2025) .................................... 12, 16, 20

*Murr v. Wisconsin*,
582 U.S. 383 (2017) .................................................... 13

*Phillips v. Washington Legal Foundation*,
524 U.S. 156 (1998) .................................................... 22

*Rodriguez v. Procter & Gamble Co.*,
465 F. Supp. 3d 1301 (S.D. Fla. 2020) ............................ 3

*Smith v. The Florida Department of Corrections, et al.*,
2020 WL 13682336 (N.D. Fla. 2020) ................................ 3

*Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) .................................................... 12, 14

*Texaco Inc. v. Short*,
454 U.S. 516 (1982) .................................................... 19

*Tulare Lake Basin Water Storage District v. U.S.*,
61 Fed. Cl. 624 (U.S. Ct. Fed. Cl. 2004) .......................... 23, 24

*Verbraeken v. Westinghouse Elec. Corp.*,
881 F.2d 1041 (11th Cir. 1989) ....................................... 2

*Webb's Fabulous Pharmacies,*
*Inc. v. Beckwith*, 449 U.S. 155 (1980) ............................ 14

**Statutes**

U.S. Const. Amend. V ................................................ 1, 11, 13, 19, 21, 22

42 U.S.C. § 1983 .......... 1, 10, 11, 22

Fla. Const. art. IX, § 6 .......... 7

Fla. Stat. § 717.102(1) .......... 17

Fla. Stat. § 717.105(1) .......... 17

Fla. Stat. § 717.106(1) .......... 17

Fla. Stat. § 717.1101(1)(a) .......... 17

Fla. Stat. § 717.113 .......... 17

Fla. Stat. § 717.118 .......... 5

Fla. Stat. § 717.1201 .......... 5

Fla. Stat. § 717.1201(1) .......... 17, 18

Fla. Stat. § 717.123 .......... 6

Fla. Stat. § 717.124 .......... 6

Fla. Stat. § 717.124(4)(a) .......... 1, 9, 13, 20, 22

Fla. Stat. Ch. 717 .......... 6, 8, 9, 13, 14, 16, 17

**Rules**

Fed. R. Civ. P. 56(c)(1)(A) .......... 2

## INTRODUCTION

This case presents a simple legal question, when the State of Florida (the "State"), acting through Defendants[1], takes custody of presumed unclaimed property and makes public use of it, does it comply with the Takings Clause of the Fifth Amendment[2]? Because Florida's Department of Financial Services ("DFS")[3] applies Section 717.124(4)(a), Florida Statutes, as prohibiting the State from paying interest on those funds to the owners when it pays their claims, the answer is "No." Since there are no genuine issues of material facts, this Court should grant Plaintiffs'[4] Motion for Partial Summary Judgment. Specifically, Plaintiffs request the Court to grant them and the Class a summary judgment declaring that 717.124(4)(a), as applied by the State, violates the Fifth Amendment and Section 1983 and is, thus, unenforceable.

---

[1] "Defendants" refers collectively to Blaise Ingoglia, in his official capacity as the Chief Financial Officer of the State of Florida, and Anastasios Kamoutsas, in his official capacity as Florida Commissioner of Education.

[2] As applied to the States by the Fourteenth Amendment.

[3] Headed by Defendant Blaise Ingoglia, as the Chief Financial Officer of the State of Florida

[4] "Plaintiffs" refers collectively to Aledia Maron and Lawrence Maron and the Class proposed for certification in Plaintiffs' Motion for Class Certification and Memorandum in Support (Dkt. 80).

## LEGAL STANDARD

Summary judgment is appropriate if materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c)(1)(A); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.").

To avoid summary judgment, the nonmovant must present "substantial evidence" to establish a factual dispute sufficient to present a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989) (citation omitted); *Smith v. The Florida Department of Corrections, et al.*, 2020 WL 13682336, at 2 (N.D. Fla. 2020) (*citing Anderson*, 477 U.S. at 248) ("Facts are 'material' with respect to the substantive law if they form disputes that are not 'irrelevant or unnecessary' and have the potential to 'affect the outcome of the suit.')). "Where material facts are not in dispute, this Court may 'resolve purely legal questions' at this stage." *Jackson v. Athena Bitcoin, Inc.*, 2025 WL 2377671, at 1 (N.D. Fla. 2025) (*citing Rodriguez v. Procter & Gamble Co.*,

465 F. Supp. 3d 1301, 1314 (S.D. Fla. 2020)). Here, Plaintiffs submit a purely legal question for this Court to resolve.

## UNDISPUTED FACTS

1. Plaintiffs had Allstate car insurance from approximately 2005 to April of 2023 with policy number 971796354.[5]

2. Plaintiffs lived at 509 Willow Run Knoll, Lakeland Florida 33813-3666, from 1980 until May of 2014.[6]

3. Documents received from Allstate Fire and Casualty Insurance Company in response to subpoenas show: (i) Plaintiffs were covered by Allstate auto policy no. 971796354 with their address at 509 Willow Run Knoll, Lakeland FL 33813-3666 on April 23, 2014, (ii) on April 23, 2014, Allstate issued a Safe Driving Bonus check to Plaintiffs for $26.24, (iii) the $26.24 was sent to Allstate's unclaimed property account on April 24, 2015, and (iv) the $26.24 was remitted by Allstate to the State on April

[5] Appendix in in Support of Plaintiffs' Motion for Class Certification and Memorandum in Support ("App.") [Dkt. 80-1 and 80-2], Ex. A, Plaintiff's First Amended Objections and Answers to Interrogatories dated March 24, 2026 ("Pl. Interog. Answers"), No. 1.; App. Ex. B, 2/13/26 Deposition of Lawrence Maron ("Maron Depo."), 32:14-33:2. *Excerpts from each cited Deposition in this Motion are attached for ease of reference.*

[6] App. Ex. A, Pl. Interog. Answers, No. 1; App. Ex. B, Maron Depo., 10:24-11:13.

16, 2020.[7]

4. The documents produced by DFS are 100% consistent with Plaintiffs' recollection and the Allstate documents, including the Plaintiffs' names and address, the policy number, the check date, amount and number, and the remittance date.[8]

5. On behalf of DFS, Phillip Carlton, the director of the unclaimed property division of DFS, verified these documents and testified, "[a]nd it lists the specific property that's involved in this case."[9]

6. When Plaintiffs visited the Florida Treasure Hunt website (fltreasurehunt.gov) (the "Treasurer Hunt Website"), which is the DFS's website for unclaimed property, they saw themselves listed as the owners of the $26.24 premium refund.[10]

7. Plaintiffs did not see any other people with their names on the

---

[7] App. Ex. A, Pl. Interog. Answers, No. 1; App. Ex. C, Allstate Documents (971796354 DEC 2013 09 05, 971796354 EBC 2014 04 25, 971796354 DEC 2014 06 12, 971796354 Payment History, 971796354 Alieda Maron and Lawrence Maron v. Blaise Ingoglia unclaimed property records, Funds on FL Unclaimed Property Website Can Be Claimed by Payee; and 03/11/26 Allstate Declaration of Custodian of Records).

[8] App. Ex. A, Pl. Interog. Answers, No. 1; App. Ex. D, DFS Documents (DFS003147-48 and DFS003149).

[9] App. Ex. E, 1/27/26 Deposition of Phillip E. Carlton ("Carlton Depo."), 13:22-23; 14:17-15:6; 16:3-4; 17:25-20:9.

[10] App. Ex. A, Pl. Interog. Answers, No. 1; App. Ex. C, Allstate Documents (Funds on FL Unclaimed Property Website Can Be Claimed by Payee).

Treasure Hunt Website.[11]

8. DFS did not directly notify Plaintiffs, nor anyone else for whom it holds unclaimed property of less than $250.00, of the presumed unclaimed property it holds for them pursuant to Section 717.1201, Florida Statutes, because it only notifies property owners for whom it holds $250.00 or more.[12] § 717.118, Fla. Stat.

9. Remittances received by the Division of Unclaimed Property of DFS (the "Division") are deposited into the Unclaimed Property Trust Fund.[13] Monies deposited into the Unclaimed Property Trust Fund are held in the State Treasury as part of a single Treasury Pool Investment Fund (the "Treasury Pool"), where all State funds are invested and earn interest, before their transfer to the State School Trust Fund. The Unclaimed Property Trust Fund is not accounted for as a separate, fund-level investment account (and is thus referred to as a "non-investible account"), which means the interest earned goes into the State's general

---

[11] App. Ex. A, Pl. Interog. Answers, No. 1.

[12] App. Ex. E, Carlton Depo., 27:17-28:5.

[13] To be clear, if non-monetary property is received, it is sold, and only after sale are the monetary proceeds deposited into the Unclaimed Property Trust Fund. App. Ex. H, 1/23/26 Deposition of Elizabeth S. Tatum, Assistant Director for the Division of Unclaimed Property ("Tatum Depo."), 33:19-34:21.

revenues and not the Unclaimed Property Trust Fund.[14]

10. Throughout the fiscal year, the Division approves claims and administers the program. Prior to the end of the fiscal year, in May and June, transfers are initiated to the State School Trust Fund. Per Section 717.123, Florida Statutes, the total transferred is any balance that exceeds $15 million.[15] Before transferring monies to the State School Fund, DFS deducts from the Unclaimed Property Trust Fund the costs incurred by the State in administering and enforcing the Act.[16] All funds held by DFS in the Unclaimed Property Trust Fund under Section 717.124, Florida Statutes, are treated the same.[17]

11. Monies deposited into the State School Trust Fund can be designated to the State School Fund, which is a separate fund-level

[14] App., Ex. F, DFS Rog. Responses, Nos 11 & 12; App. Ex. I, 1/29/26 Deposition of Tanner E. Collins, Director of the Florida Treasury ("Collins Depo."), 4:15-18; 16:2-6; 16:14-17:15; 18:2-19:18; 21:8-22:25.

[15] App. Ex. F, DFS Rog. Responses, Nos. 7 & 13; App. Ex. H, Tatum Depo., 4:13-20; 20:10-22:7.

[16] App., Ex. F, DFS Rog. Responses, No. 10; App. Ex. J, 1/7/26 Defendant Blaise Ingoglia's Fifth Supplemental Responses to Plaintiffs' First Set of Requests for Production ("DFS RFP Responses"), No. 6; App. Ex. K, DFS Expense Deduction Docs. (DFS000189 (native spreadsheet), DFS000556 (native spreadsheet), DFS002906 (native spreadsheet), DFS003134 (native spreadsheet), DFS003145 (native spreadsheet), and DFS003146 (native spreadsheet)).

[17] App. Ex. H, Tatum Depo., 18:1-11.

investment fund (referred to as an "investable account") held in the State Treasury as part of the same Treasury Pool for the State as the Unclaimed Property Trust Fund. There the monies earn interest that is credited back to the State School Fund. For the last five years, all the money in the State School Trust Fund has been designated, so all the interest has gone back to the State School Trust Fund. Had any money not been designated, it still would have been invested by the State Treasury and the interest it earned would have gone into general revenues.[18] After the money is transferred to the State School Trust Fund, no person's money is treated any differently than any other person's money.[19]

12. In the last five fiscal years, pursuant to the Florida Constitution, Article IX, Section 6, the Legislature has appropriated

---

[18] App. Ex. F, DFS Rog. Responses, Nos. 14 & 15; App. Ex. L, 1/7/26 Defendant Blaise Ingoglia's First Supplemental Responses to Plaintiffs' First Set of Requests for Admission ("DFS Admissions"), Nos. 8, 9 & 14; App. Ex. I, Collins Depo., 33:1-37:13; 47:1-48:25; App. Ex. M, 12/23/25 Defendant Anastasios Kamoutsas' Responses to Plaintiff's First Set of Requests for Admission ("DOE Admissions"), No. 5 & 7; App. Ex. N, 12/23/25 Defendant Anastasios Kamoutsas' Responses to Plaintiff's First Set of Interrogatories ("DOE Rog. Responses"), No. 7; App. Ex. O, 1/23/26 Deposition of Lila S. Pridgeon, Deputy Commissioner of Finance and Operations for DOE ("Pridgeon Depo."), 5:12-18; 23:6-22; 34:8-38:6.

[19] App. Ex. O, Pridgeon Depo., 41:20-42:5.

income and principal from the State School Fund to the support and maintenance of free public schools, including monies paid to school districts for general operations and specifically to reduce class sizes, which provides a benefit to the public. The accrual of interest on funds within the State School Fund, which includes all monies transferred from the Unclaimed Property Trust Fund, provides a public benefit by increasing the resources appropriated by the State.[20]

13. The Florida Department of Education ("DOE") pays an administrative fee to DFS (Treasury Department) out of the State School Trust Fund for administering it.[21] The Treasury Division deducts an administrative fee from the entire Treasury Pool it manages, including from the monies in the Unclaimed Property Trust Fund and the State School Fund.[22]

14. Critically, once unclaimed property in the form of money is placed in the Unclaimed Property Trust Fund, which occurs for non-monetary property after its sale by the State, "all funds under Section

[20] App. Ex. O, Pridgeon Depo., 22:6-9; 23:23-24:21; 25:3-29:13.

[21] *Id.*, 30:8-23.

[22] App. Ex. I, Collins Depo., 39:3-17.

717 are treated the same."[23] No person's money in the Unclaimed Property Trust Fund is treated differently than any other person's money. Likewise, except for the sale of non-monetary property, treatment of presumed unclaimed property does not vary by type of property.[24] The same holds true after the money is transferred to the State School Trust Fund: no person's money is treated any differently than any other person's money.[25] DFS contends its uniform treatment of unclaimed property does not constitute a compensable taking as to any owners of unclaimed property (including Class members).[26]

15. Although the statute does not expressly forbid it from doing so, DFS refuses to pay interest, *i.e.* just compensation, when it pays claims for presumed unclaimed property because it contends that Section 717.124(4)(a), Florida Statutes, forbids it to do so by requiring it to "deliver or pay over to the claimant the property or the amount that was reported and remitted to the Department by the holder or the proceeds if the unclaimed property was sold by the Department[.]" According to DFS,

---

[23] App. Ex. H, Tatum Depo., 18:1-17; App. Ex. E, Carlton Depo., 49:3-17; 57:16-58:4.

[24] App. Ex. H, Tatum Depo., 18:1-17; App. Ex. E, Carlton Depo., 49:3-17; 57:16-58:4.

[25] App. Ex. O, Pridgeon Depo., 41:20-42:5.

[26] App. Ex. E, Carlton Depo., 51:14-52:12; 53:12-19.

"[t]he agency lacks authority to deviate from or supplement this statutory directive."[27] That is the same for everyone for whom the State currently holds unclaimed property except for one very limited exception for Cuban refugees.[28]

## ARGUMENT AND AUTORITIES

### I. The Contours of a Takings Claim

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but rather it serves as a mechanism for vindicating rights otherwise protected by federal law. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002). To state a Section 1983 claim, a plaintiff must show a deprivation of a right secured by the Constitution or the laws of the United States by a person acting under color of state law. See 42 U.S.C. § 1983. There is no dispute that Defendants Ingoglia and Kamoutsas, as the State's Chief Financial Officer (the "CFO") and the State's

---

[27] App. Ex. F, DFS Rog. Responses, No.1; App. Ex. L, DFS Admissions, Nos. 4 & 11.

[28] App Ex. E, Carlton Depo., 58:6-59:9.

Commissioner of Education (the "Commissioner"), constitute persons acting under color of state law.

The Eleventh Circuit already held Plaintiffs sufficiently pled a claim under Section 1983 for violations of the Takings Clause of the Fifth Amendment, which provides: "... nor shall private property be taken for public use without just compensation." U.S. Const., Amend. V; *Maron v. Chief Financial Officer of Fla.*, 136 F.4th 1322, 1327, 1328, 1334-1336 (11th Cir. 2025). It applies to the states as well as to the federal government. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 306 n.1 (2002).

The Supreme Court has held the Takings Clause "requires the payment of compensation whenever the government acquires private property for a public purpose." *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (internal quotations omitted). "The Government has a categorical duty to pay just compensation [upon a taking]." *Horne v. Dept. of Agric.*, 576 U.S. 351, 358 (2015). The Takings Clause is "self-executing," abrogating sovereign immunity and requiring states to provide a specific remedy for takings in their own courts. *Knick v. Township of Scott*, 588

U.S. 180, 194 (2019). A claim for just compensation arises immediately at the time of the taking. *Id.*, at 192.

"No magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." *Ark. Game & Fish Comm'n v. U.S.*, 568 U.S. 23, 31 (2012). Yet, the Supreme Court has repeatedly held that "the 'classic taking [is one] in which the government directly appropriates private property for its own use.'" *Horne*, 576 U.S. at 357 (*quoting Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 (2002)). Governmental appropriations of personal property for public use constitute *per se* takings. *Id.*, at 360; *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("[t]he government commits a physical taking" when it "takes possession of property *without acquiring title to it*") (emphasis added). This includes both money and the interest earned, or that could be earned, on that money. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164-165 (1980). Even temporary possession and use of property by the government can trigger *per se* physical takings liability. *Cedar Point Nursery*, 594 U.S., at 153.

As the above authorities make clear, the State's actions under the State Disposition of Unclaimed Property Act, Chapter 717, Florida Statutes (the "Act") constitute a taking under the Fifth Amendment because the State, pursuant to the Act, took custody of Plaintiffs' money and used it for public purposes. *Knick*, 588 U.S., at 189. When the State provided in the Act that it would use presumed unclaimed property for public purposes, the Takings Clause became applicable, and it required the State to pay Plaintiffs and the Class just compensation contemporaneously with the taking.

**II. The Fifth Amendment and the Eleventh Circuit's Decision in this Case Dictate Summary Judgment in Favor of Plaintiffs and the Class Declaring that Section 717.124(4)(a), Florida Statutes, as Applied by DFS, is Unconstitutional and Unenforceable**

As set forth above, the Fifth Amendment bars the government from taking private property for public use without the payment of just compensation. *Cedar Point Nursery*, 594 U.S. at 147. In the case of a physical taking, to prevail on a takings claim, a plaintiff must prove that (1) the government physically took possession of property without acquiring title to the property, (2) made public use of it, and (3) failed to pay just compensation. *Id.* at 147-48.

The Eleventh Circuit already held in this case that this Court has subject matter jurisdiction, and "specifically, that the Marons had standing to bring Count I, that the count was ripe, and that it was not barred by sovereign immunity." *Maron*, 136 F.4th at 1328. The Eleventh Circuit also held that Plaintiffs had successfully pled the elements of their takings claim (*id.* at 1327, 1328, 1334-1336), which remain subject to proof: "(1) whether the refund was their [Plaintiffs'] property when the State took custody; (2) whether the State directly appropriated that refund for the State's own use [citation omitted]; and (3) whether the Act failed to provide just compensation by precluding the Marons from recovering any earnings on the refund post-conversion. (citation omitted)." *Id.* at 1334.

### A. Plaintiffs' Ownership of the Refund and the Class's Ownership of Their Property Held by the State Are Undisputed

As to the first issue recognized by the Eleventh Circuit, undisputed evidence proves that the Allstate Fire and Casualty Insurance Company refund in the amount of $26.24 from Allstate auto policy no. 971796354 ("Refund") belongs to Plaintiffs. *See* Undisputed Facts 1-7 *supra*. Defendants cannot provide evidence that the Refund belongs to anyone

other than Plaintiffs. Plaintiffs' testimony, Allstate's records, DFS's records, and its website conclusively prove that the Refund belongs to Plaintiffs. *See id.* Facts 4-7. Because no substantial evidence creates a dispute over the ownership of the Refund, this Court should find that there is no genuine issue of material fact that Plaintiffs own the Refund.

The Class consists of persons whose property is held by the State and who will reclaim their property from the State in the future. They will succeed in claiming their property only if DFS determines at that time that the property they are claiming belongs to them. So, by definition, all Class members own the property held in their names by the State, as a matter of law.

### B. The State's Appropriation of Plaintiffs' Refund for Public Use Is Undisputed

As to the second issue stated by the Eleventh Circuit, no dispute exists as to whether the State has taken possession of the Refund. The State lists the Refund on the Treasure Hunt Website as property in its possession, its internal records confirm its possession, Allstate's records confirm that it remitted the Refund to the State, and Defendants have never denied in this litigation that it possesses those funds. *See* Facts 1-7. As to the remainder of the Class, they consist only of persons for whom

the State holds unclaimed property in the form of money under the Act. Dkt. 80 at 3.

Likewise, no dispute exists that the State has made public use of the Refund and the presumed unclaimed property of the other members of the Class, because the State makes public use of all presumed unclaimed property it takes into possession, which use does not vary by person or property type. *See* Facts 9-14. While the State holds presumed unclaimed property in the Unclaimed Property Trust Fund, it uses it for the public benefit by paying the costs of the Unclaimed Property Division, paying the Treasury Division a management fee, and, most importantly, investing it and sending the interest earned to general revenues for appropriation by the Legislature. After it is transferred to the State School Trust Fund, the State uses the unclaimed property for the public benefit by paying a management fee from it to the Treasury Division, investing it, and paying both the interest it earns and its principal to the public schools of Florida.

### C. It Is Undisputed that DFS Applies the Act as Precluding the Payment of Just Compensation

As to the third issue listed by the Eleventh Circuit, as set forth in Fact 15, DFS refuses to pay interest when it pays claims for presumed

unclaimed property. Thus, there is no dispute that the State will not pay any interest (which is part of just compensation as explained below) to Plaintiffs and the Class on their future unclaimed property claims.

## III. The State's Legal Defenses Have Been Rejected by the Eleventh Circuit and/or Have No Merit

### A. The Act Did Not Declare or Render the Refund or the Property of Other Class Members Abandoned

As the Eleventh Circuit explained, "[t]he State argues that like the mineral owners in *Texaco[, Inc. v. Short*, 454 U.S. 516 (1982)], the Marons failed to exercise dominion over the refund within the time prescribed by the Act and the Act constitutionally declared their refund to be abandoned." *Maron*, 136 F.4th at 1334. The Eleventh Circuit rejected this argument as a matter of law as follows:

> The State's argument, however, runs against the text of the Act—which expressly declines to transfer title over unclaimed property. The Act is not an escheatment statute. Instead, the Act provides that after an owner fails to claim property for a set number of years, the property is "presumed unclaimed." *See e.g.*, Fla. Stat. §§ 717.102(1), 717.105(1) , 717.106(1) , 717.113, 717.1101(1)(a) . It does not say that property unclaimed for several years becomes abandoned or "presumed abandoned." And, after the unclaimed property is placed in the State's custody, the Act does not provide for a transfer of title, but merely gives the State "custody and responsibility for the safekeeping of the property." *Id.* § 717.1201(1).

*Id.* at 1335.

### B. Plaintiffs' and Class Members' Right to Just Compensation Does Not Depend on Whether Their Property Earned Interest Before the State Took Custody of It

The State has argued that no taking of the Refund occurred because it had not been previously earning interest.[29] This argument simply misunderstands the nature of a takings claim and the measure of just compensation.

The State committed a taking by assuming custody of the $26.24 premium refund and making public use of it. Whether it earned interest prior to the taking has no relevance. As Judge Easterbrook and the Seventh Circuit held in *Goldberg v. Frerichs*, a property owner's right to just compensation "does not depend on what it had been earning in the owner's hands." 912 F. 3d 1009, 1011 (7th Cir 2019). The Seventh Circuit gave an example very close to the situation here where Plaintiffs never received their premium refund check from Allstate. It noted that a check, which represents cash, cannot appreciate or earn interest. *Id.* But "cash has time value even if not invested." *Id.* And "[t]he Supreme Court has

[29] *See* Memorandum in Support of Defendant's Motion to Dismiss Complaint [Dkt. 9] at 11.

held that the Takings Clause protects the time value of money just as much as it does the money itself." *Id.* at 1010 (citations omitted).

Similarly, what interest, if any, the presumed unclaimed property earns in the State's hands has no relevance, as just compensation is not measured by "the public's gain." *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 237 (2003).[30] If a state had lost money on its investment of unclaimed property or if it had simply spent the money without ever investing it, the owner would still have the right to recover interest as part of just compensation, as the Supreme Court has made clear. *See Jacobs v. U.S.*, 290 U.S. 13, 17 (1933).

The basic measure of just compensation for a taking is the market value of the property at the time of the taking. *Id.* But "[t]he owner is not limited to the value of the property at the time of the taking; *he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking*. Interest at a proper rate is a good measure by which to ascertain the amount so to be added." *Id.* (internal

---

[30] Plaintiffs recognize that many cases addressing whether unclaimed property acts violate the Takings Clause discuss whether the interest earned by the State was taken. They, like the parties who briefed the cases, failed to distinguish unclaimed property acts from the Supreme Court cases discussing the taking of interest earned in IOLTA accounts *while the funds were still in private hands*. *See Brown*, 538 U.S. at 216; *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998).

quotation marks and citation omitted) (emphasis added). "Just compensation, in other words, requires that the owner be compensated not only for the value of the property on the date of the taking, but also for any delay in the payment of that amount." *Tulare Lake Basin Water Storage District v. U.S.*, 61 Fed. Cl. 624, 627 (U.S. Ct. Fed. Cl. 2004).

"[C]ourts have universally sought to honor two basic principles in calculating interest on awards paid after the date of taking." *Id.* (internal quotation marks and citations omitted). "First, courts have uniformly endeavored to ensure that [the property owner] is placed in as good as a position as he would have occupied *if the payment had coincided with the appropriation*." *Id.* (internal quotation marks and citations omitted) (emphasis added). "Second, courts have generally recognized the strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid discrimination among litigants." *Id.* (internal quotation marks and citations omitted).

At this time, Plaintiffs and the Class only request a declaration that Section 717.124(4)(a), Florida Statutes, as applied by the State, violates the Taking Clause of the Fifth Amendment and is unenforceable. Whether the Court should issue an injunction requiring the State to pay

interest on future claims, and the details of same, including the appropriate interest rate, will remain for future resolution.

However, as a matter of law, the fact that Plaintiffs' property did not bear interest at the time Allstate turned it over to the State has no relevance to whether the State's use of that property for public purposes affected a taking. *Goldberg,* 912 F.3d at 1011. Similarly, it has no relevance to the rate of interest the State must pay to justly compensate Plaintiffs and the Class. *Tulare Lake Basin Water Storage District,* 61 Fed. Cl. at 627.

**<u>CONCULSION AND REQUEST FOR RELIEF</u>**

No genuine issue of material fact exist as to the following facts: (1) Plaintiffs and the Class own the presumed unclaimed property held in their names by the State; (2) the State took custody of their property and made public use of it, and (3) when Plaintiffs and the Class successfully make their claims for the value of their presumed unclaimed property, the State will refuse to pay them the interest from the time of the taking until the time of payment required for just compensation. This entitles Plaintiffs and the Class to partial summary judgment as a matter of law.

Specifically, Plaintiffs request the Court to grant them and the Class a summary judgment declaring that Section 717.124(4)(a). Florida Statutes, as applied by the State, violates the Fifth Amendment and Section 1983 and is, thus, unenforceable, and award them any such other and further relief to which they may be justly entitled.

## CERTIFICATE OF WORD COUNT

Pursuant to N.D. Local Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing motion and memorandum in support contains 5170 words.

## CERTIFICATE OF EXCEPTION TO ATTORNEY CONFERENCE

Pursuant to N.D. Local Rule 7.1(D), the undersigned counsel hereby represents that an attorney conference was not required.

**Dated:** June 29, 2026

**OF COUNSEL:**
**SMITH, KATZENSTEIN & JENKINS LLP**
Kelly A. Green (admitted *pro hac vice*)
Julie M. O'Dell (admitted *pro hac vice*)
Lauren A. (Ferguson) Black (admitted *pro hac vice*)
1000 N. West Street, Suite 1501

**CRAIG E. ROTHBURD, P.A.**

/s/ Craig E. Rothburd
Craig E. Rothburd, FBN: 0049182
320 W. Kennedy Blvd., #700
Tampa, Florida 33606
Telephone: (813) 251-8800
Fax: (813) 251-5042
craig@rothburdpa.com
maria@rothburdpa.com

Wilmington, Delaware 19801
(302) 652-8400
kag@skjlaw.com
jmo@skjlaw.com
lab@skjlaw.com

**JEEVES LAW GROUP, P.A.**
SCOTT R. JEEVES, FBN: 0905630
2100 1ST AVE. S, SUITE 2
ST. PETERSBURG, FLORIDA 33712
TELEPHONE: (727) 894-2929
SJEEVES@JEEVESLAWGROUP.COM

**JEEVES MANDEL LAW GROUP, P.A.**
ROGER L. MANDEL
(ADMITTED *PRO HAC VICE*)
2833 CROCKETT ST
SUITE 135
FORT WORTH, TX 76107
TELEPHONE: 214-253-8300
RMANDEL@JEEVESMANDELLAWGROUP.COM

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of June, 2026, a PDF copy of the foregoing was electronically transmitted to the Clerk of the Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing, which provides notice to all counsel of record.

**CRAIG E. ROTHBURD, P.A.**

/s/ Craig E. Rothburd
Craig E. Rothburd, FBN: 0049182
320 W. Kennedy Blvd., #700
Tampa, Florida 33606
Telephone: (813) 251-8800
Fax: (813) 251-5042
craig@rothburdpa.com
maria@rothburdpa.com